**FLORIDA POWER & LIGHT COMPANY, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5151.

United States Court of Appeals, Federal Circuit.

DECIDED: July 8, 2004.

Alan I. Horowitz, Miller & Chevalier, Chartered, of Washington, DC, argued for plaintiff-appellant.

Kenneth L. Greene, Attorney, Appellate Section, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Eileen J. O'Connor, Assistant Attorney General, and Michael J. Haungs, Attorney.

Frank S. Swain, Baker & Daniels, of Washington, DC, for amici curiae Edison Electric Institute, et al.

Before SCHALL, GAJARSA, and DYK, Circuit Judges.

DYK, Circuit Judge.

Between July 1992 and June 1994, appellant Florida Power & Light Company ("FPL") paid the federal excise tax imposed on heavy motor vehicles for its fleet of utility vehicles. FPL filed suit in the Court of Federal Claims seeking a partial refund of these excise taxes, alleging that some of its vehicles fell within the mobile machinery exception to the tax. The Court of Federal Claims granted the government's motion for summary judgment, holding that FPL's vehicles did not fall within the mobile machinery exception. *Fla. Power & Light Co. v. United States*, 56 Fed.Cl. 328 (2003). We affirm.

## BACKGROUND

FPL is an electric utility company that uses a fleet of various types of specially designed vehicles to operate and maintain its power distribution system. FPL filed Heavy Vehicle Use Tax Returns and paid excise taxes pursuant to 26 U.S.C. § 4481(a)[1] on these vehicles for the annual periods from July 1, 1992, to June 30, 1993, and from July 1, 1993, to June 30, 1994. On June 24, 1995, FPL sought a partial refund of those payments in the amounts of $104,091 for the period ending June 30, 1993, and $100,936 for the period ending June 30, 1994, asserting that it had paid the excise tax on vehicles that were not subject to the tax because they fell under the mobile machinery exception to the tax set forth in 26 C.F.R. § 48.4061(a)-1(d)(2)(i).[2] This dispute involves 411 vehicles operated by FPL, including 410 vehi-

---

1. That statute provides: "A tax is hereby imposed on the use of any highway motor vehicle which (together with the semitrailers and trailers customarily used in connection with highway motor vehicles of the same type as such highway motor vehicle) has a taxable gross weight of at least 55,000 pounds...." 26 U.S.C. § 4481(a) (2000).

2. That regulation provides:

A self-propelled vehicle, or trailer or semitrailer, is not a highway vehicle if it (A) consists of a chassis to which there has been permanently mounted (by welding, bolting, riveting, or other means) machinery or equipment to perform a construction, manufacturing, processing, farming, mining, drilling, timbering, or operation similar to any one of the foregoing enumerated operations if the operation of the machinery or equipment or equipment [sic] is unrelated to transportation on or off the public highways, (B) the chassis has been specially designed to serve only as a mobile carriage and mount (and a power source, where applicable) for the particular machinery or equipment involved, whether or not such machinery or equipment is in operation, and (C) by reason of such special design, such chassis could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis.

cles equipped with pintle hooks.[3] These vehicles are used to elevate personnel to work on poles and power lines, to lift materials, to pull and push cable, and to dig holes and set poles. The pintle hook is used to attach a trailer to the vehicles to haul materials such as transformers, generators, and large coils of wire. The other type of vehicle in dispute is an insulator washer vehicle that is equipped with a 1,200–gallon capacity water tank and is used to clean energized utility lines.

On February 26, 1997, the Internal Revenue Service ("IRS") notified FPL that it intended to disallow the claims, stating that FPL's vehicles did not satisfy the requirements of part (C) of the regulation because the pintle hooks allowed the vehicles to "haul a load other than the permanently mounted machinery or equipment without substantial modification." (J.A. at 513.)[4] FPL appealed the proposed disallowance, and the IRS formally disallowed the claim on August 28, 1998.

On April 27, 1999, FPL filed suit in the Court of Federal Claims seeking recovery of $205,027 in claimed overpayments. The government moved for summary judgment with respect to all but three of the 414 vehicles at issue. However, the government did not rely on the IRS's determination that the vehicles did not satisfy the requirements of part (C) of the regulation. Rather, it argued that the vehicles did not satisfy the requirements of part (B) because the addition of a pintle hook or water tank "precludes a finding that the vehicles' chassis have 'been specially de-

signed to serve *only* as a mobile carriage and mount ... for the particular machinery or equipment involved.'" *Fla. Power & Light*, 56 Fed.Cl. at 331–32 (quoting 26 C.F.R. § 48.4061(a)–1(d)(2)(i)) (emphasis in original).

The Court of Federal Claims agreed with the government, holding that the addition of a pintle hook or water tank "precludes the application of the mobile machinery exception." *Id.* at 332. The Court of Federal Claims also rejected FPL's assertion that, even if its vehicles were not encompassed by the mobile machinery exemption, it nonetheless was entitled to recover the excise taxes pursuant to *International Business Machines Corp. v. United States*, 170 Ct.Cl. 357, 343 F.2d 914 (1965) ("*IBM*"), because the IRS, in private letter rulings, had exempted from the tax other similarly situated utility companies with which FPL competes. The court distinguished *IBM*, holding that it did not apply because FPL, unlike the taxpayer in *IBM*, had never requested its own private letter ruling from the IRS. *Fla. Power & Light*, 56 Fed. Cl. at 335.[5] Accordingly, the Court of Federal Claims granted summary judgment for the government with respect to the 411 vehicles at issue. After the parties stipulated that FPL was entitled to a refund of $1,568 for the remaining three vehicles, the court entered judgment on June 11, 2003. *Fla. Power & Light Co. v. United States*, No. 99–258T (Fed.Cl. June 11, 2003).

FPL timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).[6]

---

26 C.F.R. § 48.4061(a)–1(d)(2)(i) (2003).

**3.** A pintle hook is a "hook ... on the rear of a towing vehicle for attaching a ... trailer." *American Heritage Dictionary of the English Language* 1335 (4th ed. 2000).

**4.** The IRS erroneously stated that "all FPL's vehicles have pintle hooks." (J.A. at 513.)

**5.** The Court of Federal Claims also rejected other arguments raised by FPL, which FPL has not renewed on appeal.

**6.** *Amici curiae* Edison Electric Institute, Mobile Machinery Coalition, National Rural Electric Cooperative Association, and American Gas Association filed a brief in support of reversal.

## DISCUSSION

"We review the Court of Federal Claims' grant of summary judgment without deference." *Agwiak v. United States*, 347 F.3d 1375, 1377 (Fed.Cir.2003).

### I

### A

The first question is whether the Court of Federal Claims properly held that the appellant's vehicles were subject to the federal excise tax. The pertinent statute provides: "A tax is hereby imposed on the use of any highway motor vehicle which (together with the semitrailers and trailers customarily used in connection with highway motor vehicles of the same type as such highway motor vehicle) has a taxable gross weight of at least 55,000 pounds...." 26 U.S.C. § 4481(a). The IRS implementing regulation provides an exception for "[c]ertain specially designed mobile machinery for nontransportation functions." 26 C.F.R. § 48.4061(a)–1(d)(2)(i). On appeal, the parties contest the meaning of subsection (B) of the regulation, which provides:

A self-propelled vehicle, or trailer or semi-trailer, is not a highway vehicle if ... (B) the chassis has been specially designed to serve only as a mobile carriage and mount (and a power source, where applicable) for the particular machinery or equipment involved, whether or not such machinery or equipment is in operation....

*Id.*

Both parties agreed at oral argument that the IRS has not rendered an interpretation of the regulation that is entitled to deference under the Supreme Court's decision in *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (according "substantial judicial deference" to the IRS's reasonable "longstanding interpretation of its own regulations"), or our own decision in *American Express Co. v. United States*, 262 F.3d 1376, 1382 (Fed.Cir. 2001). Earlier decisions of our court have addressed the tax, but not the precise question before us. *See N. Ill. Gas Co. v. United States*, 833 F.2d 1582 (Fed.Cir. 1987); *Minn. Power & Light Co. v. United States*, 782 F.2d 167 (Fed.Cir.1986). Thus, we must interpret the regulation without the benefit of an agency or judicial interpretation.

### B

Both parties focus on the requirement in subsection (B) that the chassis be "specially designed to serve only as a mobile carriage and mount ... for the particular machinery or equipment involved." 26 C.F.R. § 48.4061(a)–1(d)(2)(i)(B). The appellant contends that the word "chassis" has a well-understood meaning, relying on the Society of Automotive Engineers ("SAE") definition, which states: "Motor vehicle chassis means the basic operating motor vehicle including engine, frame, and other essential structural and mechanical parts, but exclusive of body and all appurtenances for the accommodation of driver, property, or passengers, appliances, or equipment related to other than control." Society of Automotive Engineers, Inc., *SAE Glossary of Automotive Terms* 247 (2d ed. 1992).[7] The appellant thus argues that the pintle hook and water tank are

---

[7]. Dictionary definitions are similar to the SAE definition. *See, e.g.*, III *Oxford English Dictionary* 55 (2d ed. 2004) ("The base frame of a motor car, with its mechanism, as distinguished from the body or upper part...."); *Webster's Third New International Dictionary* 379 (2002) ("[T]he frame and working parts as opposed to the body (as of an automobile)....").

not part of the chassis because they are not part of the "engine, frame, [or] other essential structural and mechanical parts," as is required by the SAE definition, but instead are "appurtenance[s]" attached to the frame.[8] Even assuming that the pintle hook and water tank are not part of the chassis, the fact remains that an attachment need not be part of the chassis, so long as the chassis is modified to accommodate the attachment.

Both parties agree that the pintle hooks are bolted to the chassis. (Br. for Appellee at 7; Reply Br. for Appellant at 14 n. 5.) The appellant's design specifications for the vehicles at issue expressly require that "[t]he structure of the [pintle hook] assembly ... be rigidly affixed to the vehicle frame." (E.g., J.A. at 593.) The pintle hook assemblies are bolted to a beam that is welded to, and operates as a rear crossmember of, the chassis frame rails. Thus, the attachment requires a modification to the chassis, albeit a minor one, to accommodate the bolted connection.[9] The chassis so modified is not used to transport only the described "machinery or equipment" but also to transport materials for use with the machinery or equipment, such as trailers carrying transformers, generators, or large coils of wire. In other words, the chassis has been modified to serve also as a towing device. As such, the chassis has not been "specially designed to serve *only* as a mobile carriage and mount ... for the particular machinery or equipment involved." 26 C.F.R.

§ 48.4061(a)–1(d)(2)(i)(B) (emphasis added).

■ The appellant urges that, if an attachment to the chassis is sufficient to constitute a chassis modification, bolting anything to the chassis (that is not a modification designed to transport only the designated machinery and equipment) would make the exception inapplicable. We agree, but we think that is exactly the meaning of the regulation. Any special modification of the chassis to enable transportation of items other than the designated machinery and equipment negates the exception, even if the attachment is not part of the chassis itself. This interpretation of the regulation comports with the statute, which imposes the tax based on the taxable gross weight of the highway vehicle "together with the semitrailers and trailers customarily used in connection with highway motor vehicles of the same type as such highway motor vehicle," 26 U.S.C. § 4481(a), thus evidencing a concern with both the load of the vehicle and the load of any attached trailer. Our interpretation also comports with subsection (A) of the regulation, which appears to treat "welding, bolting, riveting, or other means" or attachment of the machinery or equipment itself as involving modifications to the chassis. *See* 26 C.F.R. § 48.4061(a)–1(d)(2)(i)(A). Accordingly, we hold that the appellant's vehicles modified to accommodate a pintle hook do not

---

**8.** The government relies on a separate part of the regulation at issue, which provides that "equipment or machinery installed on a taxable chassis or body is considered to be an integral part of the taxable chassis or body if the machinery or equipment contributes toward the highway transportation function of the chassis or body." 26 C.F.R. § 48.4061(a)–1(a)(3). We need not decide whether this definition of chassis applies under the regulation because we hold that the

appellant cannot prevail under the SAE definition.

**9.** Although the appellant has submitted affidavits stating that a pintle hook is not part of the chassis, none of these affidavits suggests that the modifications necessary to permit the bolted connection between the pintle hook and the chassis are not modifications to the chassis.

fall within the mobile machinery exception to the statute.

The appellant argues that this interpretation would have the perverse and undesirable effect of causing utilities to use two trucks to do the same job for which they now use one. However, such policy arguments are more appropriately addressed to Congress and the Department of the Treasury. *See, e.g., Marsh & McLennan Cos. v. United States,* 302 F.3d 1369, 1381 (Fed.Cir.2002).

█ The same result obtains with respect to the water tank. The parties point to no evidence in the record that indicates whether the insulator washer's chassis was modified to accommodate the water tank. It is counterintuitive that the addition of a water tank designed to carry approximately 10,000 pounds of water would not result in some alteration to the chassis, at least to attach the tank to the chassis. In any event, the burden is on the taxpayer in opposing the government's summary judgment motion to show that its vehicles fall within the exception. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." (quoting Fed.R.Civ.P. 56(c))); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The taxpayer has failed to show that the chassis is not modified to accommodate the water tank.

## II

The appellant urges that, under the decision of our predecessor court in *IBM,* it must prevail, at least with respect to the vehicles with pintle hooks, because other similarly situated taxpayers were treated more favorably. In *IBM,* the IRS issued a private letter ruling to IBM's competitor, Remington Rand, that Remington Rand's products were not subject to an excise tax for business machines. *See* 343 F.2d at 916. Shortly thereafter, IBM sought a similar ruling for its competing product, but the IRS did not act on IBM's request "for well over two years." *Id.* The IRS ultimately ruled that both IBM's and Remington Rand's machines were subject to the excise tax. *See id.* at 916–17. Accordingly, it revoked Remington Rand's favorable ruling, but it did so only prospectively. *See id.* at 916. The court held that, as a result of the disparate treatment of IBM and Remington Rand, IBM was entitled to a refund of the taxes it paid while Remington Rand's products were not subject to the tax. *Id.* at 923. The appellant in this case asserts that it was subject to similar disparate treatment, citing several IRS private letter rulings to other companies, including one ruling involving vehicles that it asserts are "apparently indistinguishable" from the vehicles at issue in this case, ruling that the attachment of a pintle hook does not disqualify a vehicle from satisfying the mobile machinery exemption. (Opening Br. for Appellant at 36.)

We need not decide whether the appellant would be entitled to relief under *IBM,* however, because the decision in *IBM* was effectively limited to its facts by subsequent decisions of the Court of Claims in *Knetsch v. United States,* 172 Ct.Cl. 378, 348 F.2d 932 (Ct.Cl.1965) ("*Knetsch II*"), and *Bornstein v. United States,* 170 Ct.Cl. 576, 345 F.2d 558 (1965).[10] *Knetsch II* and

---

10. Nor do we need to decide whether *IBM* was effectively overruled by the Supreme Court in *Dickman v. Commissioner,* 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984), which held that "it is well established that the Commissioner may change an earlier inter-

*Bornstein* were both *en banc* decisions of the Court of Claims. "When the Court of Claims sat *en banc*, . . . we are obligated to follow the court's most recent decision because an *en banc* court may modify or effectively overrule its earlier decisions." *Doe v. United States,* 372 F.3d 1347, 1355 (Fed.Cir.2004); *see also George E. Warren Corp. v. United States,* 341 F.3d 1348, 1351–52 (Fed.Cir.2003). In this case, the most recent decision of the Court of Claims is *Knetsch II.*

In *Knetsch II,* the taxpayers entered into a "tax savings scheme[ ]" whereby they claimed that the interest payments from a particular annuity contract were tax-deductible. 348 F.2d at 934. After the Supreme Court held that the payments were not deductible because the transaction was a "sham" in *Knetsch v. United States,* 364 U.S. 361, 366, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960) ("*Knetsch I*"), the taxpayers asserted that "the doctrine of equality of treatment" required that their deductions be allowed because other taxpayers who had obtained private letter rulings were able to deduct their interest payments, *Knetsch II,* 348 F.2d at 940.[11] The court disagreed, stating that the decision in *IBM* "was based on the court's evaluation of the particular circumstances in that case" and holding:

Insofar as the taxpayers' contention is that there is prejudicial discrimination because of a difference in treatment in favor of those who received and relied upon private rulings issued to them as against the instant taxpayers who neither applied for, nor received, a ruling of their own but relied solely on the private ruling issued to other taxpayers, we think there is no merit to such a contention.

*Id.* at 940 & n. 14; *see also Bornstein,* 345 F.2d at 564 n. 2 ("There are also controlling factual differences between these cases and [*IBM*]. . . . In these cases, none of the taxpayers nor the corporations in which they are shareholders asked for rulings."). Indeed, the court in *IBM* specifically noted that it rested its decision "on the . . . basis that IBM, *having taken the pains to ask promptly for its own ruling,* was entitled to have the [IRS's] ruling, in response to that request, controlled by the standard of equality and fairness incorporated in [26 U.S.C. § ]7805(b)." 343 F.2d at 924 (emphasis added). Because the taxpayer here, like the taxpayers in *Knetsch II* and *Bornstein,* and unlike the taxpayer in *IBM,* never sought a private letter ruling from the IRS, it is not entitled to claim treatment equal to those who did obtain private letter rulings.[12] Accordingly, *IBM* does not entitle the appellant to a refund.[13]

pretation of the law, even if such a change is made retroactive in effect," *id.* at 343, 104 S.Ct. 1086. *See also Hanover Bank v. Comm'r,* 369 U.S. 672, 686, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962) (holding that taxpayers "are not entitled to rely upon unpublished private rulings which were not issued specifically to them").

**11.** The Supreme Court had expressly declined to reach this issue in *Knetsch I,* where it was raised by an *amicus curiae,* because the "argument has never been advanced by petitioners in this case." 364 U.S. at 370, 81 S.Ct. 132.

**12.** In addition, in this case, unlike in *IBM,* there is no contention that the taxpayers were

adversely affected by the IRS's delay in issuing a ruling. *See IBM,* 343 F.2d at 922.

**13.** The appellant also relies on *Oshkosh Truck Corp. v. United States,* 123 F.3d 1477 (Fed.Cir. 1997), for the proposition that *IBM* should apply to it because, "unless there is a rational reason for different treatment, similarly-situated taxpayers should be treated similarly." *Id.* at 1481. However, unlike *Oshkosh,* this is not a case in which the IRS is drawing an arbitrary distinction between similarly-situated taxpayers; rather, this case involves the different situation where only the taxpayer who obtained a private letter ruling that the IRS now concedes was erroneous can benefit from the IRS's erroneous advice.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Court of Federal Claims.

*AFFIRMED.*

## COSTS

No costs.